## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**REPORTERS COMMITTEE FOR
FREEDOM OF THE PRESS,**

                              **Plaintiff,**

    **v.**

**UNITED STATES DEPARTMENT OF
JUSTICE,** *et al.*,

                              **Defendants.**

**Civil Action No.  19-2847 (TFH)**

## <u>MEMORANDUM OPINION</u>

Plaintiff Reporters Committee for Freedom of the Press ("RCFP" or "Plaintiff") brings this lawsuit against the United States Department of Justice ("DOJ"), the Federal Bureau of Investigation ("FBI"), and the Executive Office for United States Attorneys ("EOUSA"), under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, *et seq*. Plaintiff seeks records from the FBI, the DOJ Criminal Division ("Criminal Division"), and the EOUSA related to the federal government's involvement in the questioning of freelance journalist Bryan Carmody during a law enforcement raid of his San Francisco home in May 2019. RCFP alleges that (1) the three entities conducted inadequate searches for records, and (2) the FBI's invocations of FOIA Exemptions 6 and 7(C) to withhold names of two FBI Special Agents is unwarranted. Before the Court are Defendants' Motion for Summary Judgment [ECF. No. 15] and RCFP's Cross-Motion for Partial Summary Judgment [ECF. No. 16]. The Court held oral argument on the parties' motions on September 20, 2021. Upon careful consideration of the parties' submissions, oral argument, the applicable law, and the entire record, for the following reasons, the Court will

grant in part and deny in part RCFP's motion and grant in part and deny in part Defendants' motion.

## I.      Background

RCFP is a nonprofit association of reporters and editors. *See* Compl. ¶ 3 [ECF. No. 1]. Bryan Carmody is a journalist based in San Francisco, California. *Id*. ¶ 15. In April 2019, the San Francisco Police Department ("SFPD") requested Carmody's cooperation in identifying his source for an internal SFPD report concerning the death of San Francisco public defender Jeff Adachi. *Id*. ¶ 4; Declaration of Adam Marshall ("Marshall Decl.") Ex. 1 [ECF. No. 16-3]. Carmody declined to identify his confidential source. Subsequently, on May 10, 2019, the SFPD executed warrants to search Carmody's home and office, seizing his computers, phones, work product, and other devices. *See* Pl.'s Combined Statement of Material Facts as to Which there is no Genuine Issue and Resp. to Defs.' Statement of Material Facts ("Pl.'s SMF") ¶ 70 [ECF. No. 16-2]; Compl. ¶ 2; Marshall Decl. Ex. 8. While the SFPD searched Carmody's home, two FBI agents questioned Carmody. Pl.'s SMF ¶ 71; Defs.' Response to Pl.'s SMF ("Defs.' SMF") ¶ 70. Carmody refused to speak with the agents and informed law enforcement that he was a journalist. *See* Marshall Decl. Ex. 4. Upon learning of the raid, RCFP submitted the FOIA requests at issue in this case to "obtain more information about the federal government's involvement" in the matter. Pl.'s Mem. at 2 [ECF. No. 16-1].

The Carmody raid garnered significant media attention. In the aftermath, Carmody successfully moved to quash the search warrants, arguing that they were improperly issued in violation of a California shield law protecting journalists. *See* Pl.'s Mem. at 5 (citing various California State Court orders). In March 2020, San Francisco approved a $369,000 settlement to compensate Carmody for the illegal search and the seizure of his property. *Id.* at 6.

## II.      The FOIA Requests

On June 21, 2019, RCFP submitted FOIA requests concerning Carmody to the FBI, the

DOJ Criminal Division, and the EOUSA. RCFP sought:

1. All records mentioning or referring to Bryan Carmody.

2.  All records, including email correspondence, text messages, and other electronic messages, that include the term "Carmody" (case insensitive) and any of the following keywords (case insensitive):

    a. Shield
    b. Privacy Protection Act
    c. PPA
    d. Leak
    e. Leaks
    f. Subpoena
    g. Newsgathering
    h. Question
    i. Questions
    j. Questioning
    k. Media
    l. Warrant
    m. Search
    n. Seize
    o. Seizure.

3. All communications, including email correspondence, text messages, and other electronic messages between any individual at the [recipient agency] and

    a.  the San Francisco Police Department
    b.  the District Attorney's Office for the City and County of San Francisco
    c.  the San Francisco Sheriff's Department
    d.  the California Bureau of Investigation
    e.  the California Office of the Governor, and/or
    f.  the California Highway Patrol that mention, refer to, or discuss Bryan Carmody;

4. All records mentioning, referring to, or constituting the memorandum sent from the United States Attorney's Office for the Northern District of California seeking approval for questioning, arresting, or charging Bryan Carmody

Pl.'s SMF ¶¶ 74, 75, 77, 79; Defs.' SMF ¶¶ 74, 75, 77, 79.

As detailed more fully below, neither the Criminal Division nor the EOUSA produced any records in response to RCFP's requests. Pl.'s SMF ¶¶ 116, 119, 120; Defs.' SMF ¶¶ 116, 119, 120. The FBI produced one partially redacted record. Pl.'s SMF ¶ 84. The FBI redacted the names of the FBI agents who questioned Carmody, citing Exemptions 6 and 7(C).[1]

### III.    The DOJ's News Media Policy

Relevant to this case is the DOJ's policy regarding obtaining information from, or records of, members of the news media; and regarding questioning, arresting, or charging members of the news media ("News Media Policy"), codified at 28 C.F.R. § 50.10. The News Media Policy constrains the use of law enforcement with respect to journalists and mandates review and approval before questioning or seizing work product from members of the news media. Specifically, the News Media Policy mandates that:

> No member of the Department shall subject a member of the news media to questioning as to any offense that he or she is suspected of having committed in the course of, or arising out of, newsgathering activities without first providing notice to the Director of the Office of Public Affairs and obtaining the express authorization of the Attorney General. The government need not view the member of the news media as a subject or target of an investigation, or have the intent to prosecute the member of the news media, to trigger the requirement that the Attorney General must authorize such questioning.

28 C.F.R. § 50.10(f)(1).

### IV.    Legal Standard

Federal Rule of Civil Procedure 56 provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The "vast majority of FOIA cases can be resolved on summary judgment." *Brayton v. Office of the U.S. Trade*

---

[1]     The FBI also withheld file numbers under Exemption 7(A); RCFP does not challenge the FBI's withholding of file numbers.

*Representative*, 641 F.3d 521, 527 (D.C. Cir. 2011). When a federal agency moves for summary judgment in a FOIA case, the court views all facts and inferences in the light most favorable to the requester, and the agency bears the burden of showing that it complied with FOIA. *Chambers v. U.S. Dep't of Interior*, 568 F.3d 998, 1003 (D.C. Cir. 2009). The agency "must show beyond material doubt . . . that it has conducted a search reasonably calculated to uncover all relevant documents," *Weisberg v. U.S. Dep't of Justice*, 705 F.2d 1344, 1351 (D.C. Cir. 1983) (internal quotation marks omitted), and must also explain why any of the nine enumerated exemptions listed in 5 U.S.C. § 552(b) apply to withheld information, *Judicial Watch, Inc. v. Food & Drug Admin.*, 449 F.3d 141, 147 (D.C. Cir. 2006).

## V.     Adequacy of the Search

The Court will first address whether each of the defendants performed adequate searches for records. *See Moore v. Bush*, 601 F. Supp. 2d 6, 13 (D.D.C. 2009) ("The question is not whether other responsive documents may exist, but whether the search itself was adequate.").

### A.  Legal Standard

As noted above, "[t]he adequacy of an agency's search is measured by a standard of reasonableness and is dependent upon the circumstances of the case." *Weisberg*, 705 F.2d at 1351 (internal quotation marks and citations omitted). To prevail on a motion for summary judgment under FOIA, an agency must "demonstrate beyond material doubt that its search was reasonably calculated to uncover all relevant documents." *Valencia Lucena v. U.S. Coast Guard*, 180 F.3d 321, 325 (D.C. Cir. 1999). An agency can satisfy this standard by submitting "[a] reasonably detailed affidavit, setting forth the search terms and the type of search performed, and averring that all files likely to contain responsive materials (if such records exist) were searched." *Oglesby v. U.S. Dep't of Army*, 920 F.2d 57, 68 (D.C. Cir. 1990).

The agency's affidavits should be "accorded a presumption of good faith, which cannot be rebutted by 'purely speculative claims about the existence and discoverability of other documents.'" *SafeCard Servs., Inc. v. SEC*, 926 F.2d 1197, 1201 (D.C. Cir. 1991) (quoting *Ground Saucer Watch, Inc.* v. *CIA*, 692 F.2d 770, 771 (D.C. Cir. 1981)). The presumption of good faith can be overcome, and summary judgment in favor of the agency is inappropriate, if "a review of the record raises substantial doubt as to the search's adequacy, particularly in view of well-defined requests and positive indications of overlooked materials." *Reps. Comm. for Freedom of Press v. Fed. Bureau of Investigation,* 877 F.3d 399, 402 (D.C. Cir. 2017) (cleaned up); *Valencia Lucena*, 180 F.3d at 326.

### i.  FBI

The FBI has detailed its search for responsive records in two declarations from Michael G. Seidel.[2] *See* Declaration of Michael Seidel ("Seidel Decl.") [ECF No. 15-3]; Second Declaration of Michael Seidel ("Second Seidel Decl.") [ECF. No.19-4]. In responding to RCFP's FOIA request, the FBI conducted an index search of its Central Records System ("CRS"). Seidel Decl. ¶ 24. The CRS is an extensive system of records that spans the entirety of the FBI organization. *Id*. at ¶ 13. The CRS does not, however, index every individual's name or subject matter for which the FBI maintains records. *Id.* at ¶ 15. Rather, the system is indexed using two types of entries: (1) a main index entry, which is "created for each individual or non-individual that is the subject or focus of an investigation. The main subject(s) are identified in the case title of most documents in a file"; and (2) a reference index entry "created for individuals or non-individuals that are associated with the case but are not the main subjects. These subjects are not

---

2       Mr. Seidel is the Acting Section Chief of the Record/Information Dissemination Section of the Information Management Division of the FBI.

typically identified in the case title of a file." *Id.* ¶ 14. The FBI determined that to the extent there were relevant emails [and] texts "they would have been serialized and placed in the CRS for recordkeeping [and] future retrieval and located through the search." *Id.* ¶ 26.

Here, the FBI conducted an index search of the CRS for main and reference records and located one reference record. Pl.'s SMF ¶ 84; Defs.' SMF ¶ 84. The FBI also conducted a term search for "Carmody" within the relevant investigative file in which the reference record was located, which yielded no additional records. Seidel Decl. ¶ 27. Because of the way the CRS is indexed, an index search does not search the text of any underlying records maintained in the CRS. *Id.* ¶¶ 14-15.

The FBI did not search its email systems or other electronic messages in response to RCFP's request because "the FBI determined that an electronic search of emails/texts was not reasonable without a clear and certain lead from Plaintiff or in the processed record." Seidel Decl. ¶ 26.

Relevant here, in a separate records request to the SFPD (made after RCFP initiated the instant action), Plaintiff was provided a number of responsive emails sent from the FBI email accounts of FBI Special Agents. *See* Marshall Decl. ¶¶ 12-14; Exs. 6-7. The emails include discussion of the case, execution of the search warrant, and the questioning of Carmody by SFPD and the FBI. *Id.* Certain of these emails explicitly reference Carmody by name in the subject line. *Id.* at Ex. 5.

As enumerated below, an index-only search of solely the CRS does not demonstrate that, in this case, the FBI undertook "a good faith effort to conduct a search for the requested records, using methods which can be reasonably expected to produce the information requested." *Oglesby,* 920 F.2d at 68.

First, the CRS is an incomplete repository as it does not contain all potentially relevant email records. FBI personnel are not necessarily required to transfer "transitory" or "non-record" emails to the system. *See* Second Seidel Decl. ¶ 8 n.5. That a responsive record might be classified as "transitory" or "non-record" does not, however, absolve an agency of its duty to conduct a search reasonably designed to uncover such responsive records. That is, the FBI's classification of its own records does not affect its duties to search for responsive records under FOIA. Indeed, Plaintiff has affirmative proof that the FBI did not place a number of clearly responsive emails concerning Carmody in the CRS. *See* Marshall Decl. Exs. 6-7. As the D.C. Circuit has explained, "summary judgment must be denied if a review of the record raises substantial doubt about the search's adequacy, particularly in view of well-defined requests and positive indications of overlooked materials." *DiBacco v. Dep't of the Army*, 926 F.3d 827, 832 (D.C. Cir. 2019) (internal quotations omitted). Here, Plaintiff has offered not just positive indications of overlooked materials but definitive proof that such overlooked records exist.

Although the FBI correctly notes that the "fact that a particular document was not found does not demonstrate the inadequacy of a search," *Boyd* v. *Crim. Div. of Dep't of Justice*, 475 F.3d 381, 391 (D.C. Cir. 2007), the fact that responsive emails were found, in the exact location (the San Francisco Field Office) indicated in Plaintiff's request indicates that the search methodology was inadequate and not "reasonably calculated to uncover all relevant documents." *Valencia Lucena*, 180 F.3d at 325. When a request seeks information that was "plainly was not contained within CRS . . . the FBI could not put its head in the sand and ignore an obvious source for the requested material." *Jett v. Fed. Bureau of Investigation*, 139 F. Supp. 3d 352, 368 (D.D.C. 2015).

Second, even if the CRS contained all relevant records, an index search does not search the full text of the underlying documents and would therefore be unlikely to uncover all (or potentially even most) responsive documents. An index search of the CRS searches only pre-populated terms that FBI officials choose as tags. Seidel Decl. ¶¶ 14–15, 23–24. As the name suggests, indexing is done at a relatively high level, and an index search would be unlikely to uncover records with the specific keywords sought by RCFP. *See id.; see also Shapiro v. Dep't of Justice*, 944 F.3d 940, 943 (D.C. Cir. 2019) (describing an FBI index search as "akin to opening a book to a specific index entry and finding the page numbers which the indexer identified as relevant" compared to a text search, which "by contrast, combs through the *entire* (metaphorical) book to identify each instance in which the word appears in the text, as one might with an e-book."). In the context of RCFP's FOIA request, which sought email correspondence, text messages, and other electronic messages containing certain specific keywords, reliance on an index-only search cannot be "reasonably expected to produce the information requested." *Oglesby,* 920 F.2d at 68.

As previously noted, "the burden is on the agency to demonstrate that it made a good faith effort to conduct a search using methods which can be reasonably expected to produce the information requested." *DiBacco v. U.S. Army*, 795 F.3d 178, 188 (D.C. Cir. 2015). The FBI has not met its burden. Accordingly, the Court finds that the FBI's search was unreasonable and will grant summary judgment for Plaintiff as to that search.

### ii.        Criminal Division

According to a declaration submitted by Amanda Marchand Jones[3], when processing a FOIA request for records maintained by the Criminal Division, the FOIA unit "initiates a records search to the Criminal Division Section(s) believed to maintain potentially responsive records." Declaration of Amanda Jones ("Jones Decl.") ¶ 8 [ECF. No. 15-2]. Relevant here are the Policy and Statutory Enforcement Unit of the Department of Justice ("PSEU") and its database, the Front Office Tracking System ("FOTS"). Pursuant to the News Media Policy, federal law enforcement must consult with PSEU before initiating covered law enforcement interactions with journalists. *Id.* ¶ 11; *see also* 28 C.F.R. § 50.10(f)(1).  Consultation and authorization requests to PSEU are tracked in the FOTS.  *Id.* ¶ 13; Pl.'s SMF ¶¶ 113–14; Defs.' SMF ¶¶ 113-114.

Like the request to the FBI, RCFP's request to the Criminal Division specifically asked for emails, text messages, and other electronic communications. In response, the Criminal Division searched only the PSEU, as it determined that office was "most likely to maintain records responsive to Plaintiff's request" and located no responsive records. Jones Decl. ¶¶ 11-14; Pl.'s SMF ¶¶ 115-116; Defs.' SMF ¶¶ 115-116. The Criminal Division did not search emails, text messages, or other electronic messaging services. Jones Decl. ¶ 14.

The Criminal Division maintains that their search of only the PSEU was reasonable because (1) PSEU was the unit most likely to house records; and (2) "the "News Media Policy only applies to federal investigations; therefore, PSEU is not involved in the review or execution of state search warrants." Defs.' Reply at 4-5 [ECF No. 19].

---

[3]        Ms. Jones is Chief of the FOIA/Privacy Act Unit in the Office of Enforcement Operations of the DOJ Criminal Division.

If the News Media Policy was followed, responsive records would likely reside in the PSEU/FOTS. However, as Plaintiff notes, if the policy was not followed, PSEU would not have been consulted and any records concerning the decision to question Carmody would not be stored in FOTS. In the event the News Media Policy was determined not to apply, any internal deliberations discussing the decision not to consult PSEU would necessarily be housed elsewhere.

Here, the facts suggest that the News Media Policy was not followed. Pursuant to the News Media Policy, before the FBI can question a journalist it must provide notice to the Director of the Office of Public Affairs and obtain "express authorization" from the Attorney General. *See* 28 C.F.R. § 50.10(f)(1). The record of approval would then be stored in the PSEU. Carmody, a journalist, was questioned by the FBI – an activity that should have required approval – but there is no record of any authorization in the PSEU. Because the policy was seemingly not followed, the PSEU was not the unit most likely to house records concerning the decision to question Carmody, and a reasonable search would necessarily include other DOJ components.

Further underscoring the unreasonableness of searching only the PSEU, in her second declaration Ms. Jones states that "PSEU is not involved in the review or execution of state search warrants." Supplemental Declaration of Amanda Jones ("Jones Supp. Decl.") ¶ 6 [ECF. No. 19-1]. If the PSEU was entirely uninvolved in the decision to question Carmody, then responsive documents would necessarily be housed elsewhere. Searching only the PSEU is therefore unreasonable. In sum, the agency's affidavits do not sufficiently explain why "no other record system was likely to produce responsive documents" *Mobley v. CIA*, 806 F.3d 568, 582 (D.C.

Cir. 2015), and instead offer incompatible and independently insufficient rationales for limiting the search to the PSEU.

Further, Plaintiff sought communications concerning matters unrelated the News Media Policy, which could reasonably be stored outside the PSEU. For example, RCFP's request also sought records of communications between different entities mentioning Carmody and Newsgathering, Leak, Shield, and Privacy Protection Act. A search limited to PSEU/FOTS would be unlikely to uncover documents responsive to these requests.

An agency is not required to search every record system, however "the agency cannot limit its search to only one record system if there are others that are likely to turn up the information requested." *Oglesby,* 920 F.2d at 68. Because a search of only the PSEU was unreasonably narrow, the Court will grant summary judgment for Plaintiff as to the Criminal Division's search.

### iii.   EOUSA

Again, similar to the requests to the FBI and Criminal Division, RCFP's request to the EOUSA sought, in part, communications, including email correspondence, text messages, and other electronic messages between individuals at the United States Attorney's Office for the Northern District of California ("USAO/NDCA") and certain specified California law enforcement entities that mention Carmody. The EOUSA detailed their initial search in short declarations from Patricia A. Mahoney[4] and Tricia Francis[5]. Upon receipt of RCFP's request, the EOUSA forwarded the request to Ms. Mahoney to conduct a search for responsive records. Declaration of Patricia A. Mahoney ("Mahoney Decl.") ¶¶ 5-6 [ECF No. 15-5]. Ms. Mahoney

---

[4]   Ms. Mahoney is the FOIA Legal Assistant in the Criminal Division of the USAO/NDCA.

[5]   Ms. Francis is an Attorney-Advisor with the EOUSA.

and the USAO/NDCA Records Management Coordinator searched for Carmody's name in Case View (a case management database), PROMIS (a legacy case management database), and Lexis Nexis. Mahoney Decl. ¶¶ 7-10. Those searches returned no responsive records. *Id.*

In February 2020, four months after the instant suit was filed, Ms. Mahoney sent an email to all attorneys in the Criminal Division of the USAO/NDCA asking them to search their emails, correspondence, and text messages for responsive documents and to notify her if any responsive records were located.[6] Supplemental Declaration of Patricia Mahoney ("Supp. Mahoney Decl.") ¶¶ 6-7 [ECF. No. 19-2]. Ms. Mahoney received no responses to her email, and there is no information in the record as to whether any Criminal Division attorneys actually searched for records. *Id.*; Mahoney Decl. ¶ 12; Supp. Mahoney Decl. ¶ 8; Pl.'s SMF ¶ 123.

In addition to Ms. Mahoney's efforts, an Assistant United States Attorney ("AUSA") in the office "conferred with two attorneys . . . who could, in his view, possibly have had responsive records." Mahoney Decl. ¶ 13. Those attorneys told the AUSA that they had no responsive records. *Id.* He then informed Ms. Mahoney. *Id.* In addition, the office states that it searched the emails of a former attorney with the USAO/NDCA for responsive records but found none. *See* Declaration of Lester Pagtalunan[7] ("Pagtalunan Decl.") ¶¶ 4-6 [ECF. No. 19-3]; Pl.'s SMF ¶ 125; Defs.' SMF ¶ 125. Specifically, Mr. Pagtalunan, searched a former AUSA's email for the term "Bryan Carmody" within the date range of February 1, 2019 through February 1, 2020. Pagtalunan Decl. ¶ 6.

---

[6]     Ms. Mahoney informed the recipients that Plaintiff was seeking all communications, including email correspondence, text messages and other electronic messages, between USAO/NDCA employees and certain other enumerated entities, "that mention, refer to, or discuss BRYAN CARMODY." Supp. Mahoney Decl. ¶¶ 6-7.

[7]     Mr. Pagtalunan is Supervisor of the Information Technology Department of the USAO/NDCA.

Like the searches performed by the FBI and the Criminal Division, the EUOSA's search was not "reasonably calculated to uncover all relevant documents." *Valencia Lucena*, 180 F.3d at 325. Ms. Mahoney's first declaration is insufficient to satisfy the agency's obligations because it does not set forth a specific rationale – including search terms and method – supporting the reasonableness of the search. *See Oglesby*, 920 F.2d at 68 (finding an agency's search was inadequate because "the affidavit does not show, with reasonable detail, that the search method…was reasonably calculated to uncover all relevant documents. Nor does the affidavit identify the terms searched or explain how the search was conducted.");  *Reps. Comm. for Freedom of Press*, 877 F.3d at 403 (agency "declarations' principal flaw lies in their failure to set [ ] forth the search terms and the type of search performed with the specificity our precedent requires") (cleaned up).

Ms. Mahoney's first declaration represents that she only performed a search for "Bryan Carmody" in the EOUSA databases Case View and PROMIS and the public database Lexis Nexis. The affidavit provides scant detail about what records are stored in Case View and PROMIS or how those records are organized and can be located. Given the scope of the request at issue, simply searching for "Bryan Carmody" with no additional search terms and without sufficient explanation as to why Case View or PROMIS would be likely to contain responsive records is an insufficient response to a detailed FOIA request.

Ms. Mahoney's second declaration adds that she sent an office-wide email seeking responsive communications to which she received no responses. In this case, a singular office-wide email that received no responses – not even a singular response confirming receipt – is not sufficient to meet an agency's obligations under FOIA. An agency must aver "that all files likely to contain responsive materials (if such records exist) were searched." *Oglesby*, 920 F.2d at 68;

*see also Morley v. CIA*, 508 F.3d 1108, 1122 (D.C. Cir. 2007) (explaining that an affidavit that "merely identifies the [agency components] that were responsible for finding responsive documents without identifying the terms searched or explaining how the search was conducted in each component" could not justify summary judgment). Here, there is no indication that a search was ever conducted by any current NDCA Criminal Division attorneys because Ms. Mahoney did not receive any responses to her email. In response to a FOIA request, the agency must actually conduct a search of files likely to contain responsive documents. An agency averment that it merely requested agency officials perform a search is inadequate.

As discussed above, the adequacy of the agency's search is determined by looking to its overall reasonableness. Searching one former AUSA's emails with specific search terms is not enough under the circumstances. The cursory search of case management databases, without specific search terms beyond "Carmody" and an office-wide email that received no responses constitutes an unreasonable search and justifies granting summary judgment in favor of the RCFP.

## VI.    FBI's Withholdings

In response to RCFP's FOIA request, the FBI produced a one-page record containing the interview notes from its questioning of Carmody. Marshall Decl. Ex. 4. The FBI redacted from that record the names of the two agents who questioned Carmody, citing Exemptions 6 and 7(C). It also redacted file numbers under Exemption 7(A).[8] RCFP maintains the information was improperly withheld because (1) one of the agent's names is already in the public domain, (2)

---

[8]    Exemption 7(A) protects records or information compiled for law enforcement purposes, the release of which could reasonably be expected to interfere with enforcement proceedings. As previously stated, RCFP does not challenge the FBI's redactions of file numbers under Exemption 7(A).

there is no foreseeable harm in the release of this information, and (3) there is a "overriding public interest in knowing who violated longstanding DOJ rules regarding questioning members of the news media." Pl.'s Mem. at 3-4.

### 1.  Legal Standard

"FOIA Exemptions 6 and 7(C) seek to protect the privacy of individuals identified in certain agency records." *ACLU v. U.S. Dep't of Justice*, 655 F.3d 1, 6 (D.C. Cir. 2011). Exemption 6 protects "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy," 5 U.S.C. § 552(b)(6), and Exemption 7(C) protects "records or information compiled for law enforcement purposes" that "could reasonably be expected to constitute an unwarranted invasion of personal privacy," *id.* § 552(b)(7)(C). When an agency invokes both exemptions, courts "focus" on Exemption 7(C) because it "establishes a lower bar for withholding material." *Nova Oculus Partners, LLC v. U.S. Sec. & Exch. Comm'n*, 486 F. Supp. 3d 280, 288 (D.D.C. 2020) (quoting *Citizens for Responsibility & Ethics in Washington v. U.S. Dep't of Justice*, 746 F.3d 1082, 1091 n.2 (D.C. Cir. 2014)); s*ee also Judicial Watch, Inc. v. U.S. Dep't of Justice*, 365 F.3d 1108, 1125 (D.C. Cir. 2004) (noting that the Supreme Court has construed Exception 7(C) as broader than Exemption 6 and that the D.C. Circuit has "deemed the privacy inquiry of Exemptions 6 and 7(C) to be essentially the same"). Because the Plaintiff does not dispute that the records at issue in this case were compiled for law enforcement purposes as required for Exemption 7(C), the Court has "no need to consider Exemption 6 separately because all information that would fall within the scope of Exemption 6 would also be immune from disclosure under Exemption 7(C)." *Roth v. U.S. Dep't of Justice*, 642 F.3d 1161, 1173 (D.C. Cir. 2011).

Under Exemption 7(C), courts balance the privacy interests implicated by the records being sought against the public's interest in their disclosure. *Citizens for Responsibility & Ethics*, 854 F.3d at 681. The government "must account for the privacy interests at stake, recognizing that previous disclosures or admissions may have diminished those interests." *Id.* at 683. But if the withheld information implicates a substantial privacy interest, the FOIA requester "bears the burden of showing (1) that 'the public interest sought to be  advanced is a significant one, an interest more specific than having the information for its own sake,' and (2) that the information [it] seeks 'is likely to advance that interest.'" *Roth*, 642 F.3d at 1175 (quoting *Nat'l Archives & Records Admin. v. Favish*, 541 U.S. 157, 172 (2004)). It is well established that "the only public interest relevant for purposes of Exemption 7(C) is one that focuses on the citizens' right to be informed about what their government is up to." *Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106, 1115 (D.C. Cir. 2007).

In 2016, Congress enacted the FOIA Improvement Act, Pub. L. No. 114-185, 130 Stat. 538 (2016). That legislation implemented several changes to FOIA designed to increase the availability of government records to the public. *Reps. Comm. for Freedom of the Press v. Fed. Bureau of Investigation*, 3 F.4th 350, 357 (D.C. Cir. 2021). Specifically, Congress mandated that agencies may only withhold information under a FOIA exemption if the agency "reasonably foresees that disclosure would harm an interest protected by an exemption" or if "disclosure is prohibited by law[.]" FOIA Improvement Act § 2, (codified at 5 U.S.C. § 552(a)(8)(A)(i)).

**2. Analysis**

The FBI asserts that it "withheld the names of FBI Special Agents ("SAs") pursuant to Exemptions 6 and 7(C), as the FBI determined that the individuals' privacy interests outweighed any public interest in disclosure." Defs.' Mem. at 15. Specifically, the FBI asserts that

(1) disclosure of the SA's names would "prejudice their effectiveness in conducting other investigations or performing their day-to-day work"; and (2) the redactions serve "to protect FBI SAs, as individuals, from unnecessary, unofficial questioning as to the conduct of this or other investigations." *Id.* The FBI further maintains that if the SA's names are released, they "may become targets of harassing inquiries for unauthorized access to information." Second Seidel Decl. ¶¶ 16-17.

RCFP rejoins that (1) the FBI has offered only speculative claims as to the privacy interests at stake; (2) the identity of one of the special agents who questioned Carmody is in the public domain; and (3) any privacy interest in the names of these agents is overcome by the strong public interest in knowing who was involved in the questioning of a journalist in violation of the DOJ's News Media Policy. Pl.'s Mem. at 22-26.

### a. The Identity of One of the FBI Special Agents Who Questioned Carmody is in the Public Domain

Under the public domain doctrine, records that may otherwise be exempt from disclosure "lose their protective cloak once disclosed and preserved in a permanent public record." *Cottone v. Reno,* 193 F.3d 550, 554 (D.C. Cir. 1999). "The government may not rely on an otherwise valid exemption to justify withholding information that is already in the public domain." *Students Against Genocide v. Dep't of State,* 257 F.3d 828, 836 (D.C. Cir. 2001); *see also Citizens for Resp. & Ethics in Washington v. U.S. Dep't of Justice*, 840 F. Supp. 2d 226, 233 (D.D.C. 2012) ("One can have no privacy interest in information that is already in the public domain . . . .").

A plaintiff asserting a claim of prior disclosure "must bear the initial burden of pointing to specific information in the public domain that appears to duplicate that being withheld." *Public Citizen v. Dep't of State,* 276 F.3d 634, 645 (D.C. Cir. 2002); *see also Neuman v. United*

*States*, 70 F. Supp. 3d 416, 426 (D.D.C. 2014) ("Plaintiff must point to 'specific information in the public domain that appears to duplicate that being withheld.'") (quoting *Afshar v. Dep't of State,* 702 F.2d 1125, 1130 (D.C. Cir. 1983)).

Although the FBI has not officially acknowledged his role in its pleadings, one of the agent's names along with a clear indication he participated in the questioning of Carmody on May 10, 2019 appears in emails obtained and published by RCFP from the SFPD via a public records request. In its state records request, RCFP requested "copies of all emails that were sent or received between May 11, 2019 and December 31, 2019 and that contain both 'Carmody' and 'FBI.' Marshall Decl. Ex. 5. As part of the SFPD's response, it provided an email chain with the subject "Warrant Service" between Special Agent Michael Eldridge and Lt. Pilar Torres of the SFPD. The email chain begins with Lt. Torres providing information (redacted by the SFPD) to SA Eldridge on May 9, 2019 with the note "Mike, Please see the attached information." *Id.* SA Eldridge responds, "Got it, Thanks Pilar. We'll see you in the morning. Regards, Mike." *Id.* The next day, Lt. Torres sent SA Eldridge a short email update, which stated in part, "We ended up at a secondary location where we met with success! He still would not give any additional information but we still have the digital media to scrub"; to which SA Eldridge responded: "Great to hear, thanks for the update Pilar. Sorry we weren't able to get a better result for you on our end, but thanks for letting us take a shot. I spoke with Joe a little earlier, but if you guys are all right with it, we were going to try to follow up with his attorney early next week. If you need anything else from us, please let us know. We'll send over the report from today once it's finalized in our system. Regards, Mike." *Id.*

That email chain, in particular Eldridge's response in the evening of May 10, 2019, specifically identifies Eldridge as one of the agents who questioned Carmody earlier that day.

Although the FBI has not officially acknowledged the identity of the agents who questioned Carmody, neither the FBI's pleadings nor representations made at the hearings cast doubt as to the authenticity the emails or rebut the argument that Eldridge's identity is already in the public domain.  The released email chain, therefore, provides information duplicative to that being withheld and Exemption 7(C) cannot apply as to that redaction.  *See Davis v. U.S. Dep't of Justice*, 968 F.2d 1276, 1280 (D.C. Cir. 1992).

    **b.  Balancing Test**

    As to the other agent who questioned Carmody, the Court must balance the privacy interest in the release of his name his with the public interest in knowing who was involved in the questioning of a journalist in alleged violation of the DOJ's News Media Policy.

    The unknown FBI agent certainly has some privacy interests at stake. *See Schrecker v. U.S. Dep't of Justice*, 349 F.3d 657, 661 (D.C. Cir. 2003) (collecting cases) (noting that the D.C. Circuit has "consistently supported nondisclosure of names or other information identifying individuals appearing in law enforcement records, including investigators, suspects, witnesses, and informants."). Courts have credited the risk of harassment or retaliation as a legitimate reason for redaction of the names of law enforcement officers under Exemption 7(C), although courts often view those risks as more substantial when agents are involved in investigating violent or high-profile crime. *See, e.g., Garza v. U.S. Marshals Serv.*, No. CV 16-0976, 2018 WL 4680205, at *13 (D.D.C. Sept. 28, 2018) ("The Court agrees that disclosure regarding personal information of law enforcement personnel may hinder the ability to conduct ongoing investigations, may lead to unwarranted harassment, and may otherwise cause embarrassment and be an invasion of privacy, as contemplated by the exemptions."); *Brown v. F.B.I.*, 873 F. Supp. 2d 388, 404 (D.D.C. 2012) ("The risk of harassment and retaliation, in light of the

20

potentially violent crimes that were being investigated, constitutes a legitimate privacy interest."); *Lesar v. U.S. Dep't of Justice*, 636 F.2d 472 (D.C. Cir. 1980) ("[W]e find that in this instance public identification of the individuals involved in the FBI's investigation of Dr. [Martin Luther] King would constitute an unwarranted invasion of their privacy in light of the contemporary and controversial nature of the information.").

RCFP maintains that the FBI has failed to articulate specific privacy interests that would be harmed by release and relies only on conclusory assertions of potential harm. As set forth by the D.C. Circuit, after the FOIA Improvement Act, "[a]gencies cannot rely on mere speculative or abstract fears, or fear of embarrassment to withhold information. Nor may the government meet its burden with generalized assertions. In that way, the foreseeable harm requirement impose[s] an independent and meaningful burden on agencies." *Reps. Comm. for Freedom of the Press v. FBI*, 3 F.4th at 369 (cleaned up). Ultimately, the FBI has sufficiently and specifically articulated the potential foreseeable harms that may result from disclosure of the identity of the unknown SA. Although the First Seidel Declaration asserts largely speculative harms, the Second Seidel Declaration is reasonably specific as to potential harms that may result from disclosure. *Compare* Seidel Declaration ¶ 40 *with* Second Seidel Declaration ¶¶ 16-18. For instance, the Second Seidel Declaration notes that FBI agents have a privacy interest in "being free from unnecessary, unofficial questioning" and "may become targets of harassing inquiries for unauthorized access to information." Second Seidel Decl. ¶¶ 16-17. Moreover, the FBI states that "publicity (adverse or otherwise) regarding a specific investigation to which they have been assigned may seriously prejudice their effectiveness in conducting other investigations." *Id.* Those are specific harms and, when taken together with the more generalized harms stated in the first declaration and considering the reasoned conclusions of other courts in this District, the FBI

has articulated a cognizable privacy interests in the agent's name. In sum, the unknown FBI agent here – like the majority of rank and file FBI officials – has a legitimate privacy interest in keeping their name redacted.

That legitimate privacy interest is balanced against the public's interest in disclosure. In general, the public interest in this case is high. The Supreme Court has held that

> where there is a privacy interest protected by Exemption 7(C) and the public interest being asserted is to show that responsible officials acted negligently or otherwise improperly in the performance of their duties, the requester must establish more than a bare suspicion in order to obtain disclosure. Rather, the requester must produce evidence that would warrant a belief by a reasonable person that the alleged Government impropriety might have occurred.

*Nat'l Archives & Recs. Admin.*, 541 U.S. at 174. The RCFP has introduced enough evidence to warrant such a belief. Under the News Media Policy, before the FBI can question a journalist in relation to newsgathering activities it must obtain approval from the Attorney General. As noted previously, the FBI questioned Carmody but has no record of any consultation or authorization request. Although the FBI asserts that the News Media Policy did not apply in this case because the questioning related to execution of a state search warrant, that argument is rebutted by plain text of the News Media Policy which applies to "questioning [a journalist] as to *any* offense that he or she is suspected of having committed in the course of, or arising out of, newsgathering activities." 28 C.F.R. § 50.10(f)(1).

Moreover, the specter of government misconduct looms over the entire Carmody matter. California state courts quashed the search warrants executed at Carmody's home and office because those warrants were improperly obtained in violation of a California shield law. *See* Pl.'s Mem. at 5. Eventually, San Francisco approved a $369,000 settlement to compensate Carmody for the illegal search and seizure. *Id.* Given those underlying circumstances and the fact that: (1) the News Media Policy applies when federal agents question a journalist and requires

consultation and authorization; (2) federal agents questioned Carmody; and (3) no record of consultation or authorization exists, a reasonable person could conclude that the alleged government impropriety occurred.

However, even if impropriety occurred, "[i]n order to demonstrate an overriding public interest in disclosure… a plaintiff must show that the withheld information is necessary to 'shed any light on the [unlawful] conduct of any Government agency or official.'" *Lewis v. U.S. Dep't of Justice*, 609 F. Supp. 2d 80, 84 (D.D.C. 2009) (quoting *U.S. Dep't of Justice v. Reporters Comm. for Freedom of the Press,* 489 U.S. 749, 772–73 (1989)). The withholding here is simply a name of a singular rank-and-file FBI Agent – relatively little information. The RCFP does not assert that this particular agent had a supervisory role, a history of violating the News Media Policy, or that the agent had been previously disciplined for failure to abide by other DOJ policies – circumstances that might give the public a greater interest in knowing the precise agent involved. The alleged government misconduct at issue in the Carmody matter has come to light (and may continue to be revealed after the relevant agencies fully search their records), and the public can—and has—engaged in scrutiny of the FBI without knowing the identity of the unknown agent. Taken as a whole, whether the public knows the names of this particular agent is unlikely to greatly assist their right "to be informed about what their government is up to." *Nat'l Ass'n of Home Builders v. Norton*, 309 F.3d 26, 34 (D.C. Cir. 2002). RCFP has not met its burden of articulating a sufficiently strong public interest in release of the in this specific agent's name to overcome his substantial privacy interest.

## VII.   Conclusion

For the foregoing reasons, the Court will grant in part and deny in part Defendants'

Motion for Summary Judgment and grant in part and deny in part Plaintiff's Cross-Motion for

Summary Judgment. An appropriate order accompanies this opinion.

November 8, 2021

_____

Thomas F. Hogan
SENIOR UNITED STATES DISTRICT JUDGE